Minnick v. Colvin, Mr. Burns May it please the court, we're here today because an ALJ failed to properly explain why Dana Minnick did not equal List A 1.04. She did not confront the evidence indicating that he did. She improperly overruled a treating physician who indicated he needed a walker by claiming, quote, there is no need for a walker in the record. The ALJ further improperly evaluated the opinion evidence of record by favoring two state agency examiners who never looked at the client over his own examiners. Two examiners who then also provided inaccurate evidence and did not see the whole record. Lastly, she provided a credibility assessment, which was patently wrong in that she claimed that there was no objective evidence for his pain, no objective evidence for his fibromyalgia, and used his work before his onset date and a sit and squirm jurisprudence to claim he was non-credible. In cases which involve meter or equaling of listings, it is my experience that the commissioner tends to conflate meets and equals. This is certainly evident from the commissioner's brief, which spends a lot of time arguing about whether he meets 1.04. There are several elements of 1.04, all of which are met by Minnick at one point or another in the record. He has MRI evidence of nerve root compression. He has evidence of positive straight leg raising, loss of motion, and by the commissioner's own rules, namely listing 1.00E, which defines motor loss as loss of tandem motor functioning. He has that on two occasions, once at the CE, the consultative examination with Dr. Onomushi, and once with Dr. Pansy, the neurologist. The ALJ never addressed this information or these elements in the decision and gave a perfunctory listing analysis, wherein she basically just said that he has no evidence of nerve root compression, which was factually incorrect, and then skipped the rest of the elements. In a case such as this, where the client's fibromyalgia and back pain combine to meet those elements, the ALJ should have at least consulted a medical expert to determine that. She instead, and the commissioner, relied on the findings of Dr. Sands and Dr. Montoya, two doctors who did not see the entire record. After the last doctor's opinion in February of 2011, which would be Dr. Montoya, Dr. Carl noted in transcript 407 that his condition has gotten worse, significantly worse. He went to physical therapy after that, where the physical therapist noted after several therapy visits, his gait had not improved, and he continued to use a walker when he wasn't at their facility. In addition, it's also possible that denominic equals 1.04C, which as you know, requires ineffective ambulation, is defined in 1.00B2B of the listings, that he has a prescription for a walker. He used the walker on several occasions in the record, including at one point being unable to ambulate into his doctor's office, that would be again Dr. Pansy, Dr. Pansy noted in that visit that he was unable to tandem walk, and that he was unable to stand on one leg without assistance. The commissioner argued in his brief, which is not an argument found anywhere in the ALJ's decision, that when Daniel testified that he uses the walker once a week, maybe more if he needs it, that that meant that he didn't qualify for ineffective ambulation. However, I would think that the fact that he was at home most of the time, and 1.00B2B indicates that a person can still have ineffective ambulation if they don't use the walker or two crutches, two canes at home, that that means that when he left, he used the walker and thus can qualify for the listing. And somewhat of a more interesting level, if the panel does not like the arguments about the equaling the listing, the medical opinions in this file are remarkably consistent. There's Dr. Campbell's findings that the claimant is in pain, Dr. Sorg found the same thing, Dr. Campbell found it, and finally Dr. Koshman found it. All of these doctors noticed that he was in pain during the entire time that he was visiting with them. At one point, Dr. Koshman noted that he had a 50% reduction in his motion because of this. Dr. Koshman and Dr. Onamusi, who would be the CE examiner, opined in this case that he could not work, or he lacked the functional criteria for work. The ALJ rejected both of those opinions as being reserved for the commissioner. The recent case of Garcia in this court indicates that when a doctor is indicating or indicates a person cannot work, that might not be a statement of disability necessarily for an administrative purpose, but may be a medical judgment based on the doctor's opinion of the person's functional abilities. In Dr. Koshman's instance, that is clearly the case. Dr. Koshman examined Mr. Minnick twice, opined he could not work, and a letter to another doctor, Dr. Harvey, I believe, and in that circumstance qualifies as a person who not only says that he couldn't work, but then he provided two very substantive restrictions. He said that he could not bend and he could not twist. Now, SSR 96-9 defines sedentary work, which is what the eventual RFC in this case indicated. That SSR states that to perform sedentary work, a person must occasionally be able to stoop from the waist. If a person cannot bend or twist, which is what Dr. Koshman opined, then that person cannot perform sedentary work by definition from the SSR. Why do you have to be able to bend in order to do sedentary work? Your Honor, it's quite a nice question. The SSR in 96-9 states that stooping is necessary for a person to do sedentary work. What is that? To pick up stuff you drop on the floor? I would think that if you're at a workstation and you have to bend over to maybe pick up something at a lower desk or maybe something you've dropped, apparently the feeling of the agency at the time. Anyway, you don't have to stoop to pick something up, right? You don't have to bend over. I think you'd have to at least... No, you don't. Okay. But you're not supposed to stoop. That's not good for the back. Well, that may be true, but I can only work with the regulations that the agency promulgates, and that's what the SSR says. I'm going to go ahead and talk about his rebuttal really quick, or talk about his credibility very quickly. I found that the ALJ indicated that he was not credible, as I indicated, by saying that he was unable to... His pain had no basis in reality, or had no objective basis, said the same thing about his fibromyalgia. All of those things are aptly untrue. His MRI has demonstrated reason for this pain. I mean, for goodness sakes, one of the doctors called it a global radiculitis. He was recommended for surgery at one point as well. In addition, the fibromyalgia is diagnosed by even Dr. Sands, the doctor that the ALJ did rely on. So to say there's no objective evidence, then find it a severe impairment and overrule one of their own doctors seems to me over the top. So thank you. Okay. Thank you, Mr. Burns. Mr. Waldron? Good morning, Your Honors. Is that as high as it'll go? I believe it is, Your Honor. May it please the Court. The appellant alleges that he became disabled in January 2009, which was soon after he was laid off from the job that he was working for reasons that were not related to his health. The ALJ reasonably found the timing of the appellant's allegations to be more than merely coincidental. The ALJ also noted several other factors that weighed against finding the appellant disabled. For instance, he found that the appellant injured his back around his onset date, and that was partly attributable to the resumption of tree trimming work that he hadn't done in a while. The ALJ also noted that the appellant had a problem with narcotic addiction, and she also witnessed him testify at his hearing that he could not sit for any more than 30 minutes, but she personally saw him sit at the hearing for more than 40 minutes. She also noted that a year earlier he sat through an entire hour-long examination without any problem. She further noted that at that examination, the examiner noted that appellant seemed as though he wanted to present as helpless, timid, or impaired. The ALJ also noted the imaging studies that showed no more than mild to moderate lumbar degenerative disc disease. Despite a fibromyalgia diagnosis, the ALJ noted an October 2010 examination that found no evidence of fibromyalgia. Further, the ALJ noted that appellant's leg pain was diagnosed as of uncertain ideology, and then Dr. Kochman finally noted that nothing in appellant's x-rays is connected to his pain problem. But that's often true of pain. There's no x-ray evidence of it. That's true, Your Honor. And so in this case, what the ALJ did was she properly considered the other factors, the other credibility factors. And as I've stated, those weighed against finding appellant disabled. But despite the lack of objective evidence, along with the fact that appellant gave those It doesn't harp on the objective evidence. Because pain often doesn't have an identifiable organic cause. That's true, Your Honor. So I would point you to the appellant's conflicting statements, his probable narcotic addiction, and the questionable timing of his disability filing. And importantly here, despite the lack of objective medical evidence and those other factors that the ALJ found weighed against finding him completely credible, she still assessed an extremely generous residual functional capacity finding here, limiting him to a restricted range of sedentary work. Why is that generous? Because, in this case, Your Honor, it's generous because there wasn't really a lot of evidence supporting... It doesn't help him. I don't know why you say it's generous. In this case, it did not help him because the end finding was still that he was disabled. But that wasn't the ALJ's purpose. It certainly does appear that she was trying to give him the benefit of the doubt here regarding the evidence. She also had support for her findings through the medical opinions of Dr. Sands, Dr. Montoya, and Dr. Onamusi. Didn't Sands find fibromyalgia? Yes, Your Honor. He did. How does that help her findings, that there's no origin for the pain? Well, she did find specifically that Appellant did have fibromyalgia and that it was a severe impairment. And, you know, based on the fact that there was little objective medical evidence, Now, wait, what are you talking about, little objective evidence? Based on the fact that there was little... Does he have fibromyalgia or not have fibromyalgia? Yes, the ALJ found that he did. Is that somehow something subjective? I believe it does have a subjective... You do have to ask the claimant if he's feeling the pain. So there is a subjective... No, you don't. That's not how fibromyalgia is diagnosed. You press on certain points, see if there's a reaction. Right, Your Honor. That's right. But what I'm saying is that it does require a reaction, a pain reaction, when you press on those points from the claimant. So you're saying there are no reliable diagnoses of fibromyalgia? Is that what you're saying? Well, in this case, the way that fibromyalgia is supposed to be diagnosed is that there should be a finding of 11 of 18 of those trigger points when pressed upon. But you're saying it's all subjective because you can always fake and say it hurt. Is that what you're saying? I'm saying that it does require a response from the claimant when those areas are pressed upon. It's up to the ALJ to determine if that response is accurate. I'm sorry. It's up to the ALJ to determine the plaintiff's credibility and to determine the worth of that. But in this case, there was no diagnosis of fibromyalgia based on a finding of 11 of 18 trigger points. Let me ask you another question. Where do these figures... I'm looking at page 11, I think, of the ALJ's report. Where do you get these figures about 50 to 75 optical final assembler jobs in the applicants where he lives? Where do they come from? I'm not sure, Your Honor. At the hearing, the ALJ usually... And in this case, I believe he did ask plaintiff's counsel if they have any objection to the expertise of the vocational expert. In this case, they did not. And plaintiff never objected to any of these job numbers. Isn't there some directory of DOT or something? The testimony is based on the Dictionary of Occupational Titles, yes, Your Honor. Doesn't that have some statistical figures associated with it? I'm not completely sure. I don't know if it's that or if it's something else that they tie into that through their expertise and experience as vocational experts. Well... That dictionary was last updated in 1991. And it certainly doesn't have statistics for every little town in the United States. No, Your Honor. And that's where the vocational expert's testimony comes into play. His expertise comes into play. Expertise. You think he went and counted the number of people working as optical final assemblers? You think that's what they do? No, Your Honor. Where does he get the information? I don't know exactly what he does. Well, what do you think he does? I would assume that he looks at the area, which DLJ points him towards, or asks him what area he's talking about. You mean the geographic area? Yes, Your Honor. Having looked at it, what did he learn? Excuse me, Your Honor? Having looked at it, what did he learn? And how would he look at it? I mean, does he count noses? Well, these vocational experts... As for show of hands, how many people do this? Does he go to the Yellow Pages? I don't know if we have Yellow Pages. Does he go to the Yellow Pages, looks up all the opticians in this area, and then call them up and say how many employees they have? Do you think that's what he does? I don't know exactly what he does. How about a good guess? A good guess would be that what he does is that these vocational experts testify... Why don't you say he made a good guess? Well, these vocational experts work in these areas usually, and they are familiar with the areas, and what they do is they look at the job and they make their best estimation based on their previous experience, and most of these have been doing this job for years and years. So they make an estimation based on the job numbers. But in this case... You're saved by the bill. Yes, Your Honor. In this case, we would argue that the Yellow Pages decision was legally sound and supported by substantial evidence. Okay. Well, thank you, Mr. Waldron. So Mr. Burns, does he have any time left? Thank you. One minute? Yeah. Thank you. Your Honor, the rebuttal here focused mainly on the credibility issues brought up. Fibromyalgia has recently been sort of almost codified, I guess, is an okay way to put it, from SSR 12-2, which describes the trigger points which were performed at the consultative examination and ironically relied on by even Dr. Sands when he diagnosed fibromyalgia. It also indicates that a consistent report and finding by a client's or a claimant's physicians that he has the symptoms of fibromyalgia become objective findings over a course of time. So the fact that Daniel suffered from fibromyalgia is really not in doubt. The interesting invocation of his, I guess, of his work, which was a very good work history up until the time he became hurt. He even worked after he said he was in all-over pain. After he was laid off, he went back to even a harder job, which is tree trimming, where he hurt his back, and we know he hurt his back because we have the MRI showing he has a nerve root compression. Thank you for your time. Okay. Well, thank you very much, Mr. Burns. Thank you to both counsel, and the court will be in recess.